Filed 5/3/22  P. v. Ochoa CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B304386 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. LA083605 |
| TOMAS RAMOS OCHOA et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  Martin L. Herscovitz, Judge.  Affirmed and remanded.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant Tomas Ramos Ochoa.

Jin H. Kim, under appointment by the Court of Appeal, for Defendant and Appellant Guillermo Teran.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Tomas Ramos Ochoa and Guillermo Teran of two counts of murder in connection with an attempted robbery. On appeal, Ochoa argues there is insufficient evidence supporting his convictions, and the trial court made several instructional errors. Teran argues the trial court erred in admitting experimental evidence, and he received ineffective assistance of counsel. We remand Teran's case to correct an error in his abstract of judgment. We affirm the judgments in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The prosecution's case*

The People charged Teran and Ochoa with murdering Christian Barrera-Rivera and Sonny Pena. The People further alleged various firearm enhancements and special circumstances.

The People's theory at trial was that Teran shot and killed the victims as part of a plan to steal around $6,000 worth of methamphetamine (meth). Teran shot the victims at two locations, which were a few miles apart. Ochoa acted as his accomplice.

#### a. *The Tiara Street incident*

The first incident was captured on video by a surveillance camera. The video shows a white Mustang come to a stop on Tiara Street in Woodland Hills. A black Nissan pulls up to its side a few seconds later. Both cars are facing the same direction, a few feet apart, with the Nissan to the left of the Mustang. Ochoa gets out of the passenger-side door of the Mustang and walks in between the two vehicles. Although somewhat difficult to tell due to the poor quality of the video, Ochoa appears to be standing slightly behind the front passenger-side door of the Nissan, with his left arm on top of the car. A few seconds later,

four loud bangs can be heard, and the Nissan's driver-side mirror illuminates in a way consistent with a muzzle flash from a gun. The Nissan accelerates away. Ochoa immediately runs to the passenger side of the Mustang, opens the door, and climbs inside. The Mustang then takes off in the same direction as the Nissan.

b.    *The Corbin Avenue incident*

Shortly after the Tiara Street incident, James Gueringer heard a noise that sounded like a car backfiring outside his house on Corbin Avenue in Tarzana, which is a few miles east of Tiara Street. Gueringer started recording a video using his cell phone. The video shows Ochoa reaching inside the driver-side window of a black Nissan as it drives slowly down the street. Ochoa appears to be struggling with the driver. A man, later identified as Greg Shahbazian, approaches Ochoa, and Ochoa runs to the passenger side of the Nissan. A white Mustang drives between Shahbazian and the Nissan, and then the video ends.

Shahbazian testified that Ochoa, who was not armed, was "wailing on" and punching the driver of the Nissan. The driver had a "dumb" look on his face, and he did not punch back or struggle at all. As Shahbazian approached the Nissan, Ochoa moved to the opposite side of the car and started "beating up" the passenger, who did not fight back. The Nissan swerved to the left, hit a curb, and stopped moving. Ochoa ran to the Mustang carrying cash in his hands. Shahbazian went over to the Nissan and saw the passenger was breathing, but the driver was not.

Oralia Mendez was driving on Corbin Avenue around this time. She saw Ochoa get out of a white Mustang and run toward a black Nissan, which was moving slowly on the right side of the street. Ochoa started punching the driver of the Nissan with

3

his right hand.  The Nissan crashed into a curb.  Ochoa ran back to the Mustang, with cash in his right hand.  He struggled to open the door to the Mustang, but he eventually got into the car.

c.  *Physical evidence*

Pena, who was the driver of the Nissan, suffered facial abrasions consistent with being punched in the face.  He also suffered bullet wounds to his shoulder, right forearm, and right wrist.  The wound to his shoulder was fatal.  The bullet travelled from the right side of Pena's body to the left, from his front to his back, at a downward trajectory.

Barrera-Rivera suffered three gunshot wounds, two to his head and one to his right arm.  The bullets travelled from the right side of his body to the left, at a downward trajectory.  Barrera-Rivera was transported to a hospital, where he died from one of the gunshot wounds to his head.

Police discovered the Nissan's front passenger-side window was rolled down, and the front driver-side window was broken.  The two rear windows were rolled up and the glass was intact.  Police found $840 in cash in the Nissan, some of which had blood on it.  There was also a bullet hole on the inside of the Nissan's front driver-side door.  The bullet had traveled from the passenger's side of the vehicle to the driver's side, from the front of the car to the rear, at a slightly downward angle.

Police found nine-millimeter cartridge casings on Tiara Street and Corbin Avenue.  Police also found a bag containing about two pounds of meth on a street between Tiara and Corbin.  At the time, two pounds of meth had a street value of around $6,000.

A criminalist opined that all the cartridges recovered at Tiara Street and Corbin Avenue had been fired by the same

4

firearm.  He also determined bullet fragments found inside the Nissan and recovered from Pena's and Barrera-Rivera's bodies contained rifling markings that are consistent with having been fired by a Hi-Point firearm.

Police searched a white Mustang that Teran had recently purchased.  Inside, they found $100 bills with red stains.  Police also found a box of nine-millimeter bullets in Teran's house.  On Teran's phone, they discovered a photograph of his hand next to a Hi-Point firearm.

**2.      *Ochoa's defense***

Ochoa testified in his own defense.  According to Ochoa, Teran was his meth dealer.  Ochoa went to Teran's house on June 2, 2016, and Teran told him to come with him to buy meth from the victims.  Teran drove Ochoa to a gas station, where they met the victims, who were in a black Nissan.  The victims told Teran the meth cost $5,400.  They decided to make the exchange in a residential area because there were cameras at the gas station.

Teran and the victims stopped their cars next to each other on Tiara Street.  Teran gave Ochoa $2,400 and told him to give it to the victims.  Ochoa was concerned it was not enough money, but Teran said not to worry because he had already talked to the victims.

Ochoa got out of the Mustang and walked over to the Nissan, where he handed the passenger the cash.  Ochoa was standing between the front and rear doors of the Nissan, but more toward the rear.  The passenger started counting the money, at which point Teran shot into the Nissan three or four times.  Ochoa was scared and jumped back.  He did not know

5

Teran had a gun, did not expect him to shoot the victims, and did not realize Teran intended to steal from the victims.

The passenger of the Nissan died instantly, and the driver took off. Teran yelled at Ochoa to get in the Mustang. Ochoa complied because he was confused, but he did not feel threatened.

Teran started following the Nissan. Ochoa saw a bag of drugs fly out the Nissan's driver-side window and land on the street. Teran did not notice the drugs and he continued driving. Ochoa did not tell him to stop.

Teran eventually caught up to the Nissan, and the two cars stopped side-by-side. Teran fired one or two shots into the Nissan before his gun jammed. The Nissan veered to the left, but very slowly.

Teran pointed the gun at Ochoa and told him to get the drugs and money from the Nissan. Ochoa was terrified. He tried to reach into the driver's-side window of the Nissan, but the driver pushed him away. He did not punch the driver, but he may have accidentally hit him. Ochoa ran to the other side of the car, reached in through the passenger-side window, and grabbed cash that was on the floor.

Ochoa ran back to the Mustang, and Teran started to pull away. Ochoa had trouble opening the door, and he was dragged for a short distance. He eventually climbed in through the window. Teran drove to his house, where Ochoa drank tequila and changed his clothes before leaving.

3.     ***Teran's defense***

Teran presented testimony from Antje Twinn, who lived on Tiara Street. Twinn looked out her window after hearing gunshots, and she saw a person standing in front of a white car. Twinn called 911 and reported, " 'I just saw the guy who fired,

6

fired from this side. It was all so quick. Jump in the car and he fired, I think into another car.' " She later told a detective she saw a man standing outside a car fire a gun. After the detective showed her the surveillance video, she said there was a " 'huge possibility' " the driver of the car fired the gun.

Teran also presented evidence that a police officer wrote a report stating she found a spent cartridge casing within Barrera-Rivera's belongings. At trial, the officer said she made a mistake in her report, and she actually found a bullet fragment.

4.     *Verdicts and sentences*

The jury found Teran guilty of first degree murder as to both victims (Pen. Code, § 187, subd. (a)).[1] It also found true the allegations that a principal was armed with a firearm (§ 12022, subd. (a)(1)), and that Teran personally and intentionally discharged a firearm causing great bodily injury and death to the victims (§ 12022.53, subd. (d)). In addition, the jury found true special circumstance allegations that Teran committed the offenses during an attempted robbery (§ 190.2, subd. (a)(17)), he committed the offenses by shooting a firearm from a motor vehicle (§ 190.2, subd. (a)(21)), and he committed multiple murders (§ 190.2, subd. (a)(3)).

The jury found Ochoa not guilty of first degree murder, but guilty of second degree murder as to both victims. It also found true the allegations that a principal was armed with a firearm during the commission of the offenses (§ 12022, subd. (a)(1)). The court sentenced Teran to an aggregate term of 50 years to life, plus two terms of life in prison without the

---

[1]     All further undesignated statutory references are to the Penal Code.

7

possibility of parole. It sentenced Ochoa to an aggregate term of 2 years plus 30 years to life.

Teran and Ochoa timely appealed. We consolidated their appeals.

## DISCUSSION

### 1. *Substantial evidence supports Ochoa's murder convictions*

Ochoa contends there is insufficient evidence supporting his convictions for second degree murder. We are not persuaded.

In considering the sufficiency of evidence in a criminal appeal, we review the whole record in the light most favorable to the judgment to determine whether there is substantial evidence—that is, evidence that is reasonable, credible, and of solid value—so that any rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Burton* (2006) 143 Cal.App.4th 447, 451; *People v. Johnson* (1980) 26 Cal.3d 557, 578; *In re L.K.* (2011) 199 Cal.App.4th 1438, 1446.) We must " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Johnson*, at p. 576; *L.K.*, at p. 1446.) " 'The same standard applies when the conviction rests primarily on circumstantial evidence.' " (*L.K.*, at p. 1446.) Before a verdict may be set aside for insufficiency of the evidence, a party must demonstrate " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Murder is "the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice can be either express or implied. It is express when the evidence shows a deliberate intention to kill, and it is implied when the defendant

8

engages in conduct dangerous to human life, knows that the conduct endangers the victim's life, and acts with a conscious disregard for life.  (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

 " 'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.' [Citations.]  Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts."  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116–1117.)  "A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime."  (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)  "Among the factors which may be considered in determining aiding and abetting are:  presence at the crime scene, companionship, and conduct before and after the offense."  (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.)

 Here, the evidence shows the victims, Barrera-Rivera and Pena, agreed to sell Teran about two pounds of meth.  Teran and Ochoa drove together to Tiara Street, where they met up with the victims.  Ochoa got out of Teran's Mustang and handed Barrera-Rivera $2,400, despite knowing the victims agreed to sell the meth for $5,400.  Immediately after Barrera-Rivera started counting the money, Teran shot at the victims three or four times from close range.  Pena drove away.  Without hesitation, Ochoa got inside Teran's Mustang and they took off after the victims.  During the ensuing chase, Ochoa noticed Pena throw the

9

drugs onto the street, but he did not tell Teran to stop. Teran eventually caught up to the victims and fired one or two shots at them before his gun jammed. Ochoa then got out of the Mustang and, according to witnesses, repeatedly struck Pena and Barrera-Rivera, who did not fight back. Ochoa grabbed a handful of cash out of the car and ran back to the Mustang. He and Teran then drove to Teran's house, where Ochoa drank tequila.

Considered as a whole, this evidence is sufficient to show that, while possessing an intent to kill, Ochoa assisted Teran to shoot and kill the victims. In light of the discrepancy between the cost of the drugs and the amount of money Ochoa handed Barrera-Rivera, Ochoa's claim that he believed he was participating in a mere drug transaction strains credulity. Instead, as the prosecutor argued in closing, the jury could have reasonably concluded Ochoa formed a plan with Teran to shoot and kill the victims in order to steal their meth. It also could have concluded Ochoa helped Teran to execute that plan by distracting the victims with the money, accompanying Teran in the Mustang while pursuing the Nissan, and physically striking the victims to ensure they died from their wounds. Further, Ochoa's testimony that he did not tell Teran to stop after Pena threw the drugs on the street strongly suggests Ochoa did not merely want to steal the drugs; he also wanted Teran to catch up to the victims and kill them. Ochoa's testimony that he then drove with Teran to his apartment where he drank tequila provides additional circumstantial evidence that Ochoa aided and abetted Teran and shared his intent. (See *In re Juan G., supra,* 112 Cal.App.4th at p. 5 [evidence that the defendant was present at the scene of a robbery and was with the robber immediately

10

before and after the crime was sufficient to find he was an aider and abettor]; *People v. Guzman* (1996) 45 Cal.App.4th 1023, 1027 [evidence showing the defendant was with burglars at the scene of the crime and travelled in their car during an ensuing chase supported a finding that he was an aider and abettor]; *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1095 [evidence that the defendant was present at the scene of the crime, fled with the perpetrator, and was in the perpetrator's company shortly thereafter was sufficient to show she was an aider and abettor]; *People v. Conerly* (1953) 120 Cal.App.2d 343, 346 [evidence that the defendant fled from the scene of a robbery shortly after the commission of the crime supported a finding that he was an aider and abettor].)

We reject Ochoa's contention that we must limit our review to whether there is substantial evidence showing he acted with implied malice. According to Ochoa, the jury must have concluded he lacked express malice (i.e., an intent to kill), otherwise it would have convicted him of first degree murder under a felony murder theory.[2] Even if that were true, when reviewing a conviction for substantial evidence, we assess " 'whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. [Citations.] This review should be independent of the jury's

---

[2] The court instructed the jury it could convict Ochoa of first degree murder if it found that, in the perpetration of an attempted robbery, he had the intent to kill and aided and abetted the killer in the commission of murder in the first degree. (See § 189, subd. (e)(2).)

11

determination that evidence on another count was insufficient.' "[3] (*People v. Palmer* (2001) 24 Cal.4th 856, 863, quoting *United States v. Powell* (1984) 469 U.S. 57, 67.) In other words, in determining whether substantial evidence supports Ochoa's convictions for second degree murder, we do not consider the fact that the jury found him not guilty of first degree murder. As a result, we need not limit our review to whether substantial evidence shows Ochoa acted with implied malice.[4]

We also reject Ochoa's contention that the prosecutor conceded there is insufficient evidence showing he acted with an intent to kill. In support, Ochoa points to the prosecutor's discussion of felony murder during his rebuttal closing argument. Specifically, the prosecutor noted there are two theories under which the jury could convict Ochoa of felony murder: (1) he intended to kill and aided and abetted Teran in the commission of first degree murder; or (2) he was a major participant in the attempted robbery and acted with reckless indifference

---

[3]     Although Ochoa does not raise it as an issue, it is irrelevant that the People did not charge him with first degree murder and second degree murder as separate counts. When a jury is given "different crimes with which it may find defendant guilty or not guilty under one count of homicide, the case is logically indistinguishable from a case in which a greater offense and a lesser included offense are charged in separate counts." (*People v. Davis* (1988) 202 Cal.App.3d 1009, 1016.)

[4]     Ochoa's reliance on *People v. Soto* (2020) 51 Cal.App.5th 1043 (*Soto*), abrogated on another ground in *People v. Lewis* (2021) 11 Cal.5th 952, is misplaced. That case involved an appeal of a denial of a petition under section 1170.95, and the court did not consider whether substantial evidence supported the defendant's conviction. *Soto* has no application here.

to human life.  The prosecutor then remarked that "our facts" do not support the first theory, but encouraged the jury to convict Ochoa under the second theory.

Ochoa overlooks that shortly after making these remarks, the prosecutor urged the jury to convict him under a direct aiding and abetting theory because the evidence showed he "intended to help Mr. Teran in his direct intention to murder these people," wanted to rob "these people and mak[e] sure there are no witnesses," and shared Teran's goal of stealing drugs, getting their money back, and murdering the victims if necessary.  The prosecutor further argued that Ochoa's testimony alone was sufficient to convict him of willful, deliberate, and premeditated murder, which requires an intent to kill.  While we acknowledge some of the prosecutor's comments were confusing, it is clear he did not mean to concede that Ochoa lacked an intent to kill.

Even if we limited our review to an implied malice theory, we would still uphold Ochoa's convictions.  To be liable for implied malice murder, a direct aider and abettor must, by words or conduct, aid the perpetrator's commission of a life-endangering act with "knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, [and] knowledge that the act is dangerous to human life . . . ." (*People v. Powell* (2021) 63 Cal.App.5th 689, 713 (*Powell*), italics omitted.)  The defendant must also act with a conscious disregard for human life.  (*Ibid.*)  Based on the evidence summarized above, the jury could have reasonably concluded that, even if Ochoa did not specifically intend to kill the victims, he aided Teran to shoot the victims, he did so purposefully and with knowledge that it would endanger the victims' lives, and he acted with a conscious disregard for human life.

13

Ochoa insists there is no evidence showing his specific actions were dangerous to human life.  He points out that he merely handed the victims money, stood next to their car while Teran shot them, was a passenger in Teran's Mustang, and attacked the victims after they had already suffered fatal wounds.  The jury, however, did not have to find Ochoa personally committed an act dangerous to human life to convict him of murder; instead, it only had to find he aided or abetted Teran in completing such an act.  (*Powell, supra*, 63 Cal.App.5th at p. 713.)  Here, there is sufficient evidence to support a finding that Ochoa helped Teran to shoot the victims (an act dangerous to human life) by distracting them, providing Teran support and backup in the Mustang, and ensuring the victims died from their wounds.

**2.     *Ochoa has not shown prejudicial instructional error***

The trial court instructed the jury with CALCRIM No. 520, which defines malice aforethought murder.  The instruction informed the jury that a defendant acted with implied malice if:

1.   He intentionally committed the act [that caused the death of another person];

2.   The natural and probable consequences of the act[ ] were dangerous to human life;

3.   At the time he acted, he knew his act was dangerous to human life;

AND

4.   He deliberately acted with conscious disregard for human life.

Ochoa posits various problems with the court's instruction, none of which is persuasive.  First, he contends the trial court

14

had a sua sponte duty to define "natural and probable consequences" for the jury. Specifically, he insists the court should have instructed the jury with optional language in CALCRIM No. 520 stating "[a] *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."

We do not agree that the trial court had a sua sponte duty to instruct the jury with this language. The language is part of a larger, optional instruction on proximate cause.[5] The bench notes to CALCRIM No. 520 state the court must give that instruction if causation is at issue. Here, causation was not at issue, as it was undisputed that both victims died from specific gunshot wounds.

Even if the trial court had a sua sponte duty to define natural and probable consequences, its failure to do so was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18.) Ochoa insists that, had the court given the additional instruction, the jury would have concluded his actions (standing outside the Nissan, getting back in the Mustang, and hitting the victims after they had been mortally wounded) were not likely to lead to the victims' deaths unless something unusual

---

[5] The full instruction is as follows: "(An act/[or] (A/a) failure to act) causes death if the death is the direct, natural, and probable consequence of the (act/[or] failure to act) and the death would not have happened without the (act/[or] failure to act). A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."

happened. The prosecution, however, did not argue Ochoa's actions were themselves likely to lead to death, nor was the prosecution required to prove as much for the jury to convict Ochoa of implied malice murder. (See *Powell, supra*, 63 Cal.App.5th at p. 713.) Instead, the prosecution's theory was that Ochoa was guilty as an aider and abettor because he helped Teran to shoot the victims. There is no question that shooting someone, especially in the areas of the body where the victims were struck, is likely to lead to death unless something unusual happens. As a result, we have no doubt the jury would have reached the same result had the court defined natural and probable consequences.

Ochoa alternatively argues CALCRIM No. 520 is inconsistent with Senate Bill No. 1437 (2017–2018 Reg. Sess.) (SB 1437). Among other things, SB 1437 abolished the natural and probable consequences doctrine by adding subdivision (a)(3) to section 188, which states that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

As we understand his argument, Ochoa contends CALCRIM No. 520's reference to "natural and probable consequences" in the definition of implied malice allowed the jury to convict him under the natural and probable consequences doctrine. The court in *Soto, supra*, 51 Cal.App.5th 1043, rejected a similar argument, explaining that implied malice is a "distinctly different concept[ ]" from the natural and probable consequences doctrine, even though both use similar language. (*Id*. at p. 1056.) Specifically, "[i]mplied malice is a mental state for the commission of the crime of second degree murder, either by the principal or as an aider and abettor . . . to murder." (*Ibid*.)

16

It requires "the perpetrator ' "knows that his conduct endangers the life of another and . . . acts with conscious disregard for life." ' [Citation.] The 'physical component' required for implied malice murder 'is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." ' [Citation.]" (*Id.* at p. 1058.)

In contrast, the natural and probable consequences doctrine "is a theory of liability by which an aider and abettor who intends to aid a less serious crime can be convicted of a greater crime. . . . Applying the natural and probable consequences doctrine, 'a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the "natural and probable consequence" of the target crime.' [Citation.] Unlike aiding and abetting implied malice murder, which requires the aider and abettor to (at least) share the mental state of the actual perpetrator of implied malice murder, ' "aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense [e.g., murder] because the nontarget offense was not intended at all." ' " (*Soto, supra*, 51 Cal.App.5th at p. 1058.)

Here, CALCRIM No. 520's reference to "natural and probable consequences" simply defined the nature of the act necessary to find Ochoa guilty of implied malice murder. It did not permit the jury to convict him of murder solely based on his participation in a lesser target crime. As such, it does not implicate the natural and probable consequences doctrine or otherwise run afoul of the amendments made by SB 1437. (See *Soto, supra*, 51 Cal.App.5th at p. 1058; see also *People v.*

*Rivera* (2021) 62 Cal.App.5th 217, 232 [SB 1437 did not change the definition of implied malice, which incorporates the idea of natural and probable consequences]; *People v. Martinez* (2007) 154 Cal.App.4th 314, 334 ["the use of the term 'natural consequences' in the CALCRIM No. 520 definition of implied malice does not import into the crime of murder the case law relating to the distinct 'natural and probable consequences' doctrine developed in the context of aiding and abetting liability"].)

We also reject Ochoa's contention that, in light of the amendments made by SB 1437, a defendant may be convicted of second degree murder only if (1) he had express malice or (2) his actions were a direct cause of death. Although not stated directly, Ochoa is essentially arguing that SB 1437 abolished second degree implied malice murder for aiders and abettors. Our Supreme Court, however, recently explained that "notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life," which is the mental state required for implied malice murder. (*People v. Gentile* (2020) 10 Cal.5th 830, 850.) In other words, SB 1437 did not eliminate second degree implied malice murder for aiders and abettors.[6]

---

[6] In light of the Supreme Court's approval of second degree implied malice murder for aiders and abettors, we reject Ochoa's cursory argument that an aider and abettor of second degree murder must possess express malice.

### 3. *The trial court did not abuse its discretion by admitting experimental evidence*

Teran argues the trial court abused its discretion by admitting evidence of an experiment showing it would have been difficult for Ochoa to have shot the victims on Tiara Street. He also argues his trial counsel provided ineffective assistance by failing to object to the evidence on federal due process grounds. We reject both arguments.

Detective Steve Castro—who was the investigating detective on the case—testified on direct examination that he conducted an experiment to see if Ochoa would have been physically able to shoot the victims on Tiara Street. Teran objected that the prosecutor did not disclose the experiment during discovery. The prosecutor responded that the parties discussed the experiment at the preliminary hearing, which Ochoa's counsel confirmed. The court found this resolved the discovery issue.

Teran then objected that the testimony was too speculative because Castro could not have conducted the experiment under conditions sufficiently similar to the actual shooting. Specifically, he argued the surveillance video did not clearly show where Ochoa was standing, and Castro was not the same height and weight as Ochoa. The court overruled the objection, noting that Teran could address these issues on cross-examination.

Castro then testified that he found a car that was the same make and model as the victims' car, and he stood in the same position relative to the car where Ochoa was standing when the shots were fired. According to Castro, in order to shoot the victims from that position, Ochoa would have had to reach out his arm parallel to the ground while bending his wrist to

19

the left, which is an unusual shooting stance. Castro found it difficult to reach his arm out far enough, and he explained it is difficult to control the recoil of a gun with a bent wrist. Therefore, he would have expected the bullets to scatter if Ochoa were the shooter, which was not consistent with the physical evidence.

On cross-examination, Castro clarified that he believed the video showed Ochoa was standing even with the back edge of the Nissan's front passenger-side window. He acknowledged, however, it is possible Ochoa was closer to the center of the window, in which case he would not have had to reach as far outward with his arm. Castro also acknowledged he did not know the victims' precise positions when they were shot.

" ' "Experimental evidence has long been permitted in California trial courts . . . ." ' [Citation.] ' "Admissibility of experimental evidence depends upon proof of the following foundational items: (1) The experiment must be relevant [citations]; (2) the experiment must have been conducted under substantially similar conditions as those of the actual occurrence [citation]; and (3) the evidence of the experiment will not consume undue time, confuse the issues or mislead the jury [citation]." ' [Citation.] The proponent of the experimental evidence has the burden to show that the conditions were substantially similar but need not show that they were absolutely identical. [Citation.] We review the trial court's decision to admit experimental evidence for abuse of discretion. [Citation.]" (*People v. Jackson* (2016) 1 Cal.5th 269, 342.)

Teran argues the trial court abused its discretion by admitting evidence of Castro's experiment because the prosecution failed to establish the conditions of the experiment

20

were substantially similar to those of the actual shooting. Specifically, he points to four problems with the experiment: (1) the prosecution did not establish that the car Castro used in his experiment was manufactured the same year as the victims' car; (2) Castro did not know the victims' positions when they were shot; (3) it was impossible to determine with accuracy Ochoa's location based on the surveillance video; and (4) Castro was three inches taller than Ochoa. We are not persuaded that these issues rendered Castro's testimony inadmissible.

As to Teran's first contention—that the prosecution failed to establish when the car was manufactured—he forfeited the issue by failing to raise it below. (*People v. Waidla* (2000) 22 Cal.4th 690, 717 (*Waidla*).) The purpose of the forfeiture rule "is to bring errors to the attention of the trial court so they may be corrected or avoided." (*People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468.) Had Teran raised this specific issue in the trial court, it is likely the prosecutor could have adequately addressed it. At the preliminary hearing, Castro testified that he located and took measurements of a Nissan that was the same model year as the victims' car. Although not entirely clear from the record, it appears Castro was referring to the same vehicle he used to perform the experiment. In any event, Teran's argument also fails on the merits because he has not shown a difference in model years would have significantly affected the results of Castro's experiment. (See *People v. McCurdy* (1958) 165 Cal.App.2d 592, 598 ["The burden is upon the appellant affirmatively to show prejudicial error."].)

We are similarly unpersuaded by Teran's argument that it was impossible for Castro to recreate the shooting with sufficient accuracy because he did not know the victims' precise positions.

21

Once again, Teran did not raise this specific issue below, which forfeits it on appeal.[7] (*Waidla, supra*, 22 Cal.4th at p. 717.)  His argument also lacks merit.  The evidence shows the victims were struck while seated in the Nissan's front seats, they did not suffer any wounds to their lower bodies, the bullets travelled through the car's front passenger-side window, and no bullets struck the car's ceiling, floor, dashboard, or windshield.  Considered together, these facts significantly limit the possible positions of the victims and trajectories of the bullets.  While we acknowledge it was impossible for Castro to recreate the shootings perfectly without knowing the victims' precise locations, perfection is not required.  The jury was well aware of the limitations of Castro's experiment and capable of determining the appropriate weight to give his testimony in light of those limitations.

For similar reasons, we reject Teran's argument that Castro's testimony was inadmissible because he could not determine Ochoa's precise location from the surveillance video. The video shows Ochoa standing between the Nissan and Mustang at the time of the shooting.  Given the angle of the video and the fact that the Nissan obstructs the view of Ochoa's lower body, it is impossible to determine his precise location.  As the Nissan drives away, however, it is apparent Ochoa is standing well behind the Mustang's front driver-side door.  Given the Nissan and Mustang were positioned side-by-side, and both cars appear to be roughly the same length, it is reasonable to infer Ochoa was also positioned to the rear of the Nissan at the time

---

[7]     Teran addressed the issue while cross-examining Castro, but he did not specifically argue the evidence was inadmissible on this basis.

of the shooting. This is further supported by the fact that the Nissan travels a short distance before Ochoa's lower body becomes visible on the video. Although the quality of the surveillance video is far from ideal, it provides sufficient support for Castro's assumption that Ochoa was standing to the rear of the Nissan's front passenger-side door.[8]

Finally, we reject Teran's contention that the fact Castro was three inches taller than Ochoa rendered the evidence of the experiment inadmissible. Castro acknowledged this discrepancy while testifying, and he explained that Ochoa's shorter stature likely would have made it even more difficult for him to shoot the victims. Teran complains that Castro's opinion was apparently based on his belief that Ochoa had shorter arms, for which there is no evidence in the record. The jury, however, was able to observe Castro and Ochoa over the course of the trial and determine their relative arm lengths.

Teran's reliance on *People v. Bonin* (1989) 47 Cal.3d 808, is misplaced. In that case, the defendant allegedly strangled a victim to death using a t-shirt. (*Id.* at p. 823.) At trial, a criminalist testified that he wrapped a t-shirt around his upper arm, which produced similar markings to those found on the victim's neck. (*Id.* at p. 846.) The Supreme Court held the testimony was inadmissible because the prosecution failed to show the criminalist conducted the experiment under conditions similar to those of the victim's strangulation. (*Id.* at p. 847.) The high court noted it is not self-evident that the criminalist's

---

[8] Teran complains that Castro never testified that he placed his left arm on the Nissan, as Ochoa appears to do in the surveillance video. Teran did not raise this issue below, which forfeits it on appeal. (*Waidla, supra*, 22 Cal.4th at p. 717.)

upper arm and the victim's neck were similar in relevant aspect, nor is it self-evident that the criminalist applied pressure to his arm the way the defendant allegedly exerted force to the victim's neck.  (*Ibid*.)  In addition, the criminalist essentially admitted on cross-examination that he was unqualified to conduct the experiment.  (*Ibid*.)

In *Bonin*, aside from the criminalist's use of a t-shirt, there were no apparent similarities between the conditions of the experiment and the victim's strangulation.  Here, in contrast, the record discloses the most relevant conditions were substantially similar.  Specifically, Castro conducted the experiment using a car that was the same make and model as the victim's car, he positioned himself where he believed the video showed Ochoa was standing, and he attempted to fire shots into the car in a way that would produce results consistent with the physical evidence.  Moreover, unlike the criminalist in *Bonin*, there is no question that Castro was qualified to conduct the experiment.

Teran alternatively argues his counsel provided ineffective assistance by failing to object to Castro's testimony on federal due process grounds.  Teran's argument presupposes that the testimony was inadmissible because it lacked a proper foundation, and he fails to provide any independent reason why its admission violated his constitutional rights.  For the reasons discussed above, we reject Teran's argument that the testimony lacked proper foundation.  Accordingly, we also reject his derivative ineffective assistance of counsel claim.

**4.** ***Teran's trial counsel did not provide ineffective assistance by failing to object to improper opinion testimony***

Teran argues his trial counsel provided ineffective assistance by failing to object to Detective Castro's testimony that Ochoa gave truthful answers during an interrogation. We disagree.

Castro testified that he interrogated Ochoa prior to trial. According to Castro, Ochoa initially denied getting out of the Mustang at Tiara Street, and denied going to the driver's side of the Nissan on Corbin Avenue. Castro then told Ochoa they had video footage of the incidents. At that point, Ochoa admitted he got out of the car at Tiara Street and also went to the driver's side of the Nissan at Corbin Avenue.

In response to questions from Ochoa's counsel, Castro reiterated that Ochoa did not tell him everything about the incidents at the beginning of the interrogation. Defense counsel asked if, after Castro revealed he had video footage, Ochoa told him what happened. Castro replied, "We got more truthful answers at that point."

A little later, Ochoa's counsel asked Castro, "Did [Ochoa] tell you honestly, after you told him you have the video, what happened in the video, what was depicted in the video?" Teran's counsel objected to the form of the question. The court sustained the objection and told Ochoa's counsel to rephrase the question. Counsel then asked, "Did he describe the events in the video accurately as [to] his participation?" The court overruled Teran's objection, and Castro answered, "Yes, the answers became more truthful as the interview continued, him knowing that we had a video." Ochoa's counsel then asked, "Did you find him honest

25

after you told him you had the video?" The court sustained Teran's objection to the question.

The prosecution introduced into evidence a heavily-edited transcript of Ochoa's interrogation. The transcript does not include any statements that would tend to incriminate Teran. Ochoa subsequently testified in more detail about the interrogation. Among other things, he testified that, before he knew about the videos, he told Castro that Teran was the shooter.

On appeal, Teran argues his trial counsel provided ineffective assistance by failing to object to Castro's testimony that " '[w]e got more truthful answers' " from Ochoa and his " 'answers became more truthful as the interview continued, him knowing that we had a video.' " Teran insists the testimony constituted an improper lay opinion about the veracity of another person's statements, and there was no tactical reason for his counsel not to object to it. (See *People v. Melton* (1988) 44 Cal.3d 713, 744 ["Lay opinion about the veracity of particular statements by another is inadmissible on that issue."].)

Under either the federal or state Constitution, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceedings] cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984) 466 U.S. 668, 686.) To establish a claim for ineffective assistance of counsel, a defendant must show (1) that his lawyer's performance was deficient because it fell below an objective standard of reasonableness in all the circumstances; and (2) that absent those errors, a different outcome was reasonably probable,

meaning a probability sufficient to undermine confidence in the outcome. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1030.)

Assuming for the sake of argument that trial counsel should have objected to Castro's testimony, Teran has not shown a different outcome was reasonably probable absent those errors. According to Teran, the testimony was prejudicial because it conveyed to the jury that Castro believed Ochoa's claim that Teran was the shooter, thereby bolstering Ochoa's credibility on that issue. The record does not support this contention. At the time Castro made the challenged remarks, the jury was not aware that Ochoa said anything during his interrogation that would incriminate Teran, including that Teran was the shooter. Although Ochoa subsequently testified that he identified Teran as the shooter during the interrogation, he insisted he did so before he knew about the videos. Given Castro made the challenged remarks in response to questions regarding the veracity of Ochoa's answers *after* he learned of the video evidence, it is not reasonably probable the jury would have understood him to be commenting on the veracity of Ochoa's assertion that Teran was the shooter. Teran does not identify any other specific statements Ochoa made during the interrogation that were prejudicial to him.

Teran argues Castro's testimony that Ochoa became " 'more truthful' " after learning of the video necessarily implies Ochoa was somewhat truthful before then. Contrary to Teran's claim, such an inference is far from necessary; a true statement, after all, is "more truthful" than a completely false one. We also do not think it is reasonably probable the jury understood Castro's testimony in the manner Teran suggests. Instead, it is clear from context Castro intended to covey that, while Ochoa's statements

27

after learning about the videos were somewhat truthful, they were not entirely truthful.

Even assuming the jury understood Castro's testimony to mean he believed Ochoa was truthful when he claimed that Teran was the shooter, counsel's failure to object was nevertheless harmless. Before Castro made the challenged remarks, he testified that his experiment showed it would have been very difficult for Ochoa to have shot the victims on Tiara Street. The jury, therefore, was already aware that Castro believed Teran was likely the shooter. As a result, it is not reasonably probable the jury would have reached a different outcome had Teran's counsel objected to Castro's testimony that Ochoa became "more truthful" during his interrogation.

**5.** ***There is no cumulative error requiring reversal***

Teran and Ochoa argue the cumulative effect of all the errors at trial requires reversal of their convictions. "In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068; accord, *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) We are satisfied that Teran and Ochoa received a trial that was fair and comported with due process.

**6.** ***The court must correct Teran's abstract of judgment***

Teran's abstract of judgment indicates the jury convicted him of two counts of willful, deliberate, and premediated murder. Teran and the Attorney General agree, as do we, that this is a mistake. Although the jury convicted Teran of two counts of first degree murder, it did not specifically find the murders were

28

willful, deliberate, and premeditated.[9]  Accordingly, on remand, the trial court shall issue a new abstract of judgment correcting this error.

## DISPOSITION

Ochoa's judgment is affirmed.  We remand Teran's case to the trial court to prepare an amended abstract of judgment reflecting that the jury convicted him of two counts of first degree murder, but it did not specifically find the murders were willful, deliberate, and premeditated.  The trial court shall forward a certified copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.  Teran's judgment is affirmed in all other respects.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EGERTON, J.

We concur:



LAVIN, Acting P. J.                    LIPNER, J.[*]

---

[9]     The court instructed the jury it could find Teran guilty of first degree murder under three distinct theories, one of which was that the murder was willful, deliberate, and premeditated.

[*]     Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.